**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FTD, LLC, a Delaware Limited Liability )
Company, )
      Plaintiff, )
            )   Case No. 24 CV 997
      v. )
            )
Charlie Cole, a citizen of Washington State, )
            )
      Defendant. )

**COMPLAINT**

FTD, LLC ("FTD"), by and through its undersigned counsel, as and for its complaint for

violations under the Defend Trade Secrets Act, violations under the Illinois Trade Secret Act,

and breach of contract against Defendant Charlie Cole alleges as follows:

**NATURE OF THE CASE**

1.   This case presents an emergency concerning the ongoing irreparable misuse of

confidential information, trade secrets, disparagement of FTD, and recruitment of FTD

employees, all orchestrated by FTD's former Chief Executive Officer, Defendant Charlie Cole

("Cole"), to improperly compete with FTD in violation of his express contractual obligations

and applicable Federal and Illinois statutory law.

2.   FTD is a world-famous brand and is in the business of selling floral arrangements

and other gifts online through its proprietary network of florists and telecommunications

services. FTD hired Cole as its CEO in March 2020, at which time he signed an Employment

Agreement (the "Agreement"). The Agreement contained certain reasonable restrictions on

Cole's ability to (i) use FTD's confidential trade secrets; (ii) criticize or disparage FTD; (iii)

compete with FTD; (iv) solicit FTD employees; and (iv) hire FTD executives.

3.      A true and correct copy of the Agreement, with certain redactions to protect confidential information, is attached as Exhibit A to this Complaint. An unredacted copy is available to Cole and will be offered to be made available to the Court for review *in camera.*

4.      On March 1, 2023, Cole resigned from FTD to accept the position of CEO with an FTD competitor, client, and customer, Tribute Technology US, LLC ("Tribute"). Like FTD, Tribute is in the business of selling floral arrangements online and has its own proprietary network of florists. Tribute also uses wire services, including FTD, to fulfill orders and is, therefore, also a FTD client and customer.

5.      When FTD learned that Cole intended to join Tribute, FTD's view was that Cole's employment with Tribute would constitute a breach of his non-compete obligation, but that FTD would be willing to forbear from enforcing Cole's non-compete on the *express condition* that Cole would comply with all of his other contractual restrictive covenants and other obligations. Accordingly, in June 2023, FTD wrote to Cole to make sure that Cole understood that FTD's forbearance from enforcing Cole's non-compete obligation was conditioned upon him complying with all of his other contractual restrictive covenants and other obligations. In response, Cole assured FTD that he would, in fact, comply with all of his other contractual restrictive covenants and other obligations.

6.      But, during the week of January 22, 2024, FTD discovered that Cole has been and continues to be in material breach of his contractual obligations. Specifically, FTD discovered that Cole had previously recorded and publicly posted an hour-long Webinar (the "Webinar") on Tribute's publicly available website in which, among other things, Cole criticizes and disparages FTD and its business model, and claims that Tribute's own proprietary network of florists is superior to wire service model used by FTD.

7.    In the Webinar, Cole also divulges FTD's highly confidential trade secrets, including information regarding the rate at which consumers allegedly return products and demand refunds from FTD and information regarding FTD's experimentation with strategies to better understand florist's inventory levels.

8.    Upon discovering the existence of the Webinar, FTD contacted Cole to discuss the Webinar. FTD started to detail the breaches that were apparent in the Webinar and, before FTD could even articulate all of them, Cole became upset and claimed that "Everything on that video is true, and if I have hurt your feelings you'll just have to deal with it." Cole left no doubt that he would not have the Webinar removed from Tribute's website. As of the date of this filing, the Webinar is still available online for all the world to see, which compels FTD to seek injunctive relief.

9.    As an inducement to convince FTD to forbear from enforcing his non-compete, Cole also repeatedly promised to use his new role as Tribute's CEO to support and partner with FTD so that Tribute would, Cole promised, give more business than ever to FTD. However, in actual practice, Cole has failed to give any more business to FTD, and instead has done nothing but undermine FTD's business while poaching its employees.

10.    In light of these recent developments, FTD brings this complaint to protect its legitimate business interests, and necessarily must request certain emergency, preliminary and other relief to compel Cole to take down the disparaging and improper Webinar that he posted online, and to compel Cole to comply with the restrictive covenants and confidentiality obligations contained in his Employment Agreement.

**THE PARTIES**

11.    FTD, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. FTD, LLC's members are themselves also limited liability

3

companies or a sequence of limited liability companies whose respective ultimate beneficial owners are individuals domiciled in Arizona, California, Connecticut, Delaware, Florida, Illinois, Indiana, Kentucky, Minnesota, Missouri, New York, North Carolina, Ohio, Tennessee, Texas, Virginia, or foreign countries outside of the United States.

12. Charlie Cole is an individual who is a citizen of the State of Washington, and living in Seattle, Washington.

## JURISDICTION AND VENUE

13. This Court has original federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because FTD pleads a claim pursuant to the federal Defend Trade Secrets Act, which expressly authorizes original claims in the federal district courts at 18 U.S.C. § 1836(c).

14. This Court also has subject matter jurisdiction over this dispute based upon the principles of diversity set forth at 28 U.S.C. § 1332 because FTD and Cole are citizens of different states and the amount in controversy exceeds $75,000 because, among other reasons, the value of the confidential trade secrets at issue and the value of the injunctive relief sought exceeds $75,000.

15. This Court also has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over the state claims alleged herein because those claims are related to the federal Defend Trade Secrets Act claim and form part of the same case or controversy.

16. Cole is subject to specific personal jurisdiction in this Court because this lawsuit arises out of a contract he made with an a company headquartered in Illinois, Cole's breaches of that contract are directed towards Illinois and have caused damage in Illinois, Cole's violations of state and federal trade secrets laws are directed towards Illinois and have caused damage in Illinois, and Cole's other tortious acts are directed towards Illinois.

17.     In his Agreement with FTD, Cole agreed to irrevocably submit to the exclusive jurisdiction of any federal court sitting in the Northern District of Illinois or any state court in Cook or DuPage counties over any suit, action or proceeding arising out of or relating to his Agreement, and irrevocably waived any objection to venue or forum *non conveniens* in this Court. (Ex. A, Agreement § 9(d)).

18.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) & (3) because, among other reasons, a substantial part of the events or omissions giving rise to the claims occurred in this district, Cole is subject to personal jurisdiction in this district, and Cole has contractually agreed to lay venue in this district.

## BACKGROUND

*FTD's Business*

19.     FTD is in the business of selling floral arrangements and other gifts through its proprietary Mercury Network of florists and telecommunications services ("FTD's Wire Service Network"). Established in 1910 as a collective of 10 florists, today, FTD's Wire Service Network has grown into an extensive network made up of thousands of local florists across the globe who hand craft and hand deliver floral arrangements and other types of gifts to consumers.

20.     Most of FTD's sales are generated by partnering with businesses that offer FTD products for sale to consumers online and then use and depend on FTD's Wire Service Network to fulfill orders.

21.     Consumers can also purchase products directly from FTD and, in those cases, FTD uses its Wire Service Network to fulfill orders.

*Cole's Employment with FTD*

22.     In March 2020, FTD hired Cole as its Chief Executive Officer.

23. Cole received a substantial executive compensation package in connection with his employment at FTD.

24. At FTD, Cole performed all of the duties typical of a CEO, including being the face of the company, promoting FTD's business, and analyzing FTD's confidential information to help it outperform the competition.

25. Upon joining FTD, and as a condition of his employment, Cole executed his Employment Agreement.

26. Pursuant to Section 6 of Cole's Agreement, Cole agreed to comply with non-compete, non-solicitation, non-interference, no-hire, and non-disparagement restrictions, which are quoted in detail below (collectively, the "Restrictive Covenants").

27. Pursuant to the Agreement, Cole is required to comply with the Restrictive Covenants during the term of his employment and for eighteen months thereafter (the "Restricted Period"), except that for certain "Core Competitor" the period is two years after his departure. (Ex. A, Agreement § 6(a-c)).

28. The Agreement provides that "[t]he period of time during which the provisions of this Section 6 [the Restrictive Covenants] shall be in effect shall be extended by the length of time during which Executive is in breach of the terms hereof as determined by any court of competent jurisdiction on the Company's application for injunctive relief." (Ex. A, Agreement § 6(e)). This is referred to herein as the "Tolling Period."

29. Pursuant to the Agreement, Cole is restricted from competing with FTD during the Restricted Period and the Tolling Period:

(i) *During the Employment Term and for eighteen (18) months thereafter (the "Restricted Period"), Executive will not . . . solicit or assist in soliciting in competition with the Restricted Group (as defined below) in the Business,* [or] *the business of any then-current or prospective client or customer*

*with whom Executive (or Executive's direct reports) had personal contact on behalf of the Company during the one (1)-year period immediately preceding Executive's termination of employment.*

(ii) *During the Restricted Period, Executive will not directly or indirectly*:

(A) *engage in the Business anywhere in the United States*, or in any other country where the Restricted Group engages in the Business and derives not less than 20% of its revenue as of the last day of the Employment Term, including, for the avoidance of doubt, by entering into the employment of or rending any services to a Core Competitor, except where such employment or services do not relate in any manner to the Business;

(B) *acquire a financial interest in, or otherwise become actively involved with, any Person engaged in the Business*, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant; or

(Ex. A, Agreement § 6(a)) (emphasis added).

30.     Pursuant to the Agreement, Cole is restricted from adversely interfering with, or attempting to adversely interfere with, FTD's business relationships during the Restricted Period and the Tolling Period:

During the Restricted Period, Executive will not directly or indirectly: . . . (C) intentionally and adversely interfere with, or attempt to adversely interfere with, business relationships between the members of the Restricted Group and any of their clients, customers, suppliers, partners, equity holders or investors; provided, however, that nothing in this Agreement shall restrict Executive's ability to engage freely with the following entities: Bounce Exchange, Conversion Path and January Digital.

(Ex. A, Agreement § 6(a)).

31.     The Agreement defines "Restricted Group" to mean, "collectively, the Company [FTD] and its subsidiaries and, to the extent engaged in the Business, their respective affiliates (including Nexus Capital Management LP and its affiliates)." (Ex. A, Agreement § 6(b)(iv)(A)).

32.     The Agreement defines "Business"  to mean "any business or enterprise that, directly or indirectly (including through an affiliate or franchisees) provides or is engaged in the

floral business anywhere in the world in a manner that is competitive with the business, activities, products or services of the type conducted, offered, or provided by the Company or any of its subsidiaries . . ." (Ex. A, Agreement § 6(b)(iv)(B)).

33.     Pursuant to the Agreement, Cole is restricted from soliciting FTD employees during the Restricted Period and the Tolling Period:

> *During Executive's employment hereunder and the Restricted Period*, Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any Person, directly or indirectly: (i) *solicit or encourage any employee, including executive-level employees, of the Restricted Group to leave the employment of the Restricted Group*; [or]

(Ex. A, Agreement § 6(b)) (emphasis added).

34.     Pursuant to the Agreement, Cole is restricted from hiring FTD executive-level employees during the Restricted Period and the Tolling Period:

> *During Executive's employment hereunder and the Restricted Period*, Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any Person, directly or indirectly: . . . (ii) *hire any executive-level employee who was employed by the Restricted Group* as of the date of Executive's termination of employment with the Company or who left the employment of the Restricted Group coincident with, or within six months prior to or six months after, the date of Executive's termination of employment with the Company . . .

(Ex. A, Agreement § 6(b)) (emphasis added).

35.     Pursuant to the Agreement, Cole is subject to a non-disparagement clause during the Restricted Period and the Tolling Period:

> During the Restricted Period, Executive agrees not to make, or cause any other person to make, any communication that is intended to criticize or disparage, or has the effect of criticizing or disparaging, the Company . . .

(Ex. A, Agreement § 6(c)).

36.     The non-disparagement clause in the Agreement includes a carve-out that allows Cole to "speak publicly with respect to his opinion or assessment of the general industry in which the Restricted Group sells products or services *as long as such statements do not*

*specifically reference any member of the Restricted Group [FTD] or their respective performance or prospects.*" (Ex. A, Agreement § 6(c)) (emphasis added).

37.     In the Agreement, Cole and FTD expressly understood and agreed that the Restrictive Covenants were reasonable. (Ex. A, Agreement § 6(d)) ("Executive and the Company consider the restrictions contained in this Section 6 to be reasonable . . .").

38.     Pursuant to Section 7 of the Agreement, Cole agreed to safeguard FTD's non-public, proprietary or confidential information, including trade secrets:

> Without the prior written authorization of the Board, Executive will not at any time (whether during or after Executive's employment with the Company), (x) retain or use for the benefit, purposes or account of Executive or any other Person; or (y) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside the Company (other than Executive's professional advisers who are bound by confidentiality obligations or otherwise in performance of Executive's duties under Executive's employment and pursuant to customary industry practice), any non-public, proprietary or confidential information of the Company or its subsidiaries - including, without limitation, trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals - concerning the past, current or future business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to the Company on a confidential basis (collectively, the "Confidential Information").

(Ex. A, Agreement § 7).

39.     Pursuant to the Agreement, upon the termination of Cole'e employment with FTD, he was required to "cease and not thereafter commence use of any Confidential Information. . ." (Ex. A, Agreement § 7(a)(iv)).

40.     Pursuant to the Agreement, upon the termination of Cole'e employment with FTD, he was required to "immediately destroy, delete, or return to the Company, at the

Company's option, all originals and copies in any form or medium . . . that contain Confidential Information . . ." (Ex. A, Agreement § 7(a)(iv)).

41.     The confidentiality obligations included in Section 7 of the Agreement are, collectively, referred to herein as the "Confidentiality Obligations."

42.     Cole acknowledged that violations of his Restrictive Covenants or Confidentiality Obligations would cause FTD irreparable harm for which monetary damages alone would be difficult or impossible to calculate and would, further, fail to provide an adequate remedy. (Ex. A, Agreement § 8).

43.     Accordingly, Cole agreed that actual or threatened violations could be properly addressed with injunctive relief, including a temporary restraining order and a temporary or permanent injunction:

> Executive acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Section 6 and Section 7 of this Agreement may be inadequate and the Company may suffer irreparable damages as a result of such breach or threatened breach. In recognition of this fact, Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled, in addition to any other remedy available at law or equity, to cease making any payments or providing any benefit otherwise required by this Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

(Ex. A, Agreement § 8).

44.     The Agreement contains an Illinois choice-of-law clause and, thus, is subject to Illinois law. (Ex. A, Agreement 9(c)).

*FTD's Confidential Information and Trade Secrets*

45.     Competition between FTD and its competitors, including Tribute, is intense and, in order to effectively compete, safeguarding confidential information and trade secrets is of the utmost importance to FTD.

10

46. In order to perform his job responsibilities, Cole was given access to confidential information and trade secrets related to FTD's business ("FTD's Confidential Information and Trade Secrets").

47. The FTD Confidential Information and Trade Secrets at issue in this litigation include information regarding (i) FTD's Wire Service Network; (ii) the rates at which consumers return products and demand refunds for ordered fulfilled using FTD's Wire Service Network ("Return Rates"); and (iii) experimental strategies explored by FTD to better understand florist's inventory levels and to better serve consumers (the "Inventory Strategies").

48. FTD spends a substantial amount of time and money analyzing its business, the market, and related data to generate information related to its Return Rates and to explore Inventory Strategies.

49. FTD has taken reasonable measures to keep secret its Confidential Information and Trade Secrets, such as information regarding its Return Rates and Inventory Strategies, including by requiring employees with access to such information to sign restrictive covenants and by limiting disclosure of such information only to those with a need to know it.

50. Information regarding FTD's Return Rates is critical to its position in the marketplace. A high return rate is generally interpreted to mean that consumers are dissatisfied with their purchases. A low return rate suggests to florists and consumers that the products sold are better than the competition. Therefore, if a competitor were to become aware of FTD's Return Rates, it would know whether it was at a competitive advantage or disadvantage, and could attempt to claim superiority over FTD.

51. Information regarding FTD's experimental Inventory Strategies is highly confidential. If a competitor were to become aware of those Inventory Strategies, it would be

able to unfairly exploit innovations that FTD worked hard on and spent money to explore and implement.

52. Information regarding FTD's Return Rates and Inventory Strategies is not available to FTD's competitors or to the public through lawful means, and FTD derives a competitive advantage from the confidentiality of such information.

53. FTD's Confidential Information and Trade Secrets derive independent economic value, actual or potential, from not being generally known and not being readily ascertainable though proper means.

54. Indeed, this information, which FTD paid Cole to assemble and understand over years with considerable time, expense, and effort, is protected by FTD and is not otherwise available to the general public or known in the floral industry. Such information would be difficult to duplicate and would be valuable to a competitor looking to compete with FTD.

55. As a result, information regarding FTD's Return Rates and Inventory Strategies constitute confidential information and trade secrets, and Cole's misuse, disclosure, and misappropriation of such information has caused FTD to suffer irreparable harm.

56. In addition to Cole's actual misuse, disclosure and misappropriation of FTD's Confidential Information and Trade Secrets, it also is inevitable that he will misappropriate other FTD Confidential Information and Trade Secrets if he is permitted to continue operating in violation of the Restrictive Covenants given his prior position with FTD, the identity and similarity of his new position with Tribute.

*Cole Resigns to Join Tribute, Which is an FTD Competitor, Client and Customer*

57. On or about March 1, 2023, Cole tendered his resignation from FTD.

58. Upon information and belief, Cole began working for Tribute in March 2023.

59. Tribute is a direct competitor of FTD that is in the business of selling floral arrangements online with a specialty in sympathy and memorial arrangements.

60. Tribute sells floral arrangements by partnering with funeral homes that offer floral arrangements for sale to consumers online and then use Tribute's proprietary network of florists and telecommunications platform to fulfill orders ("Tribute's Propriety Network").

61. In addition to being a competitor, Tribute is also a client and customer of FTD in that Tribute sometimes uses the FTD Wire Service Network to fulfill orders.

62. Throughout Cole's time at FTD and during the year immediately prior to his departure from FTD, Tribute was one of the clients and customers that Cole had personal contact with on behalf of FTD.

63. Tribute, like FTD, has a nationwide presence.

64. Upon information and belief, the services that Cole performs for Tribute include services that are the same or are substantially the same as the services that Cole performed for FTD given the similarities between the two businesses and given the fact that Cole was the CEO of FTD and is now the CEO of Tribute.

65. Upon information and belief, Cole has or will acquire financial interests in Tribute as part of his executive compensation package.

*FTD Relies on Cole's Assurances*

66. When FTD learned that Cole intended to join Tribute, FTD's view was that Cole's employment with Tribute would constitute a breach of his non-compete obligation.

67. FTD's view was that it would be willing to forbear from enforcing Cole's non-compete on the *express condition* that Cole would comply with all of his other contractual restrictive covenants and other obligations.

68. Shortly after Cole's departure from FTD, three executive-level employees tendered their resignations and went to work for Tribute (i) Matt Powell, FTD's Chief Technology Officer; (ii) Jaime Cresto, FTD's Director of Strategic Partnerships/Sales; and (iii) Vicky Hayes, FTD's Senior Florist Account Manager.

69. Cole, Mr. Powell, Ms. Cresto, and Ms. Hayes each represented to FTD that Cole had not solicited them to work for Tribute.

70. As a result, at the time, FTD did not have sufficient evidence to conclude that Cole had had breached the Restrictive Covenants and Confidentiality Obligations in his Agreement (aside from his non-compete).

71. In April 2023, and again in June 2023, FTD contacted Cole to remind him regarding several of his contractual obligations, including without limitation, the Restrictive Covenants and Confidentiality Obligations in his Agreement.

72. In June 2023, FTD also wrote to Cole to make sure that Cole understood that FTD's forbearance from enforcing Cole's non-compete obligation was conditioned upon him complying with all of his other contractual restrictive covenants and other obligations.

73. In response to FTD's June 2023 letter, Cole assured FTD that he would, in fact, comply with all of his Restrictive Covenants and Confidentiality Obligations, aside from his non-compete.

74. As an additional inducement for FTD to provide its conditional forbearance, after his departure from FTD, Cole assured FTD that, although he would be working in a directly competitive position at Tribute, Cole would take steps as Tribute's CEO to process more Tribute orders through FTD's Wire Service Network.

14

75.     FTD reasonably relied upon Cole's assurances regarding his compliance with his Agreement.

76.     FTD reasonably relied upon Cole's assurances regarding his delivering more business volume to FTD.

*FTD Discovers that Cole Improperly Posted a Disparaging Webinar Online That Reveals FTD Confidential Information and Trade Secrets*

77.     During the week of January 22, 2024, FTD discovered that Cole posted an hour-long webinar on Tribute's website in which Cole divulges FTD's confidential information and bashes FTD and its Wire Service Network (the "Webinar").

78.     In the Webinar, Cole discloses FTD Confidential Information and Trade Secrets, including the following information:

(a) Information regarding FTD Return Rates, including the *exact percentage* at which consumers allegedly return products or demand refunds for products purchased through FTD's Wire Service Network; and

(b) Information regarding FTD Inventory Strategies, including details related to what Cole disparagingly characterized as "wholly flawed" experimental efforts by FTD to monitor the inventory levels of florists in its network.

79.     In the Webinar, Cole made, and caused others to make, statements intended to criticize or disparage FTD and that had the effect of criticizing or disparaging FTD.

80.     In the Webinar Cole made, and caused others to make, statements intended to adversely interfere with, or attempt to adversely interfere with, FTD's business.

81.     The Webinar reveals Cole doing the following:

(a) Cole made disparaging remarks regarding wire services including FTD, and referenced FTD by name while doing so.

(b) Cole claimed that FTD's Return Rate was higher than the rate of consumer returns for arrangements fulfilled using Tribute's Propriety Network.

(c) Cole claimed that wire services, such as FTD, had "unsolvable problems" because they could not monitor florist's inventory levels in real time.

(d) Cole claimed that FTD Inventory Strategies were "wholly flawed."

(e) Cole referred to "FTD" and then claimed that "the quality is so much better when we [Tribute] have a direct relationship with our florists."

(f) Cole claimed that Tribute's Proprietary Network is superior to wire service networks, because Tribute has "constant communication with [florists] through propriety networks that allow real time conversions like availability, inventory, etcetera."

(g) Cole claimed that, because Tribute is "as close as possible to the florists" in Tribute's Proprietary Network, the arrangements fulfilled using its network were superior to the arrangements filled by wire service companies, such as FTD.

(h) Cole claimed that Tribute has a "much better financial relationship with our florists than the wire services."

(i) Cole claimed that orders placed through Tribute's Proprietary Network were less likely to be rejected by busy florists.

(j) Cole claimed that orders placed through Tribute's Proprietary Network were "moved to the top of the list" by florists and treated with greater priority than orders placed through wire services, such as FTD's Wire Service Network.

(k) Cole claimed that the quality of the florists available using Tribute's Propriety Network is superior to the quality of the florists available on wire services such as FTD's Wire Service Network.

(l) Cole suggested that wire service companies, such as FTD, should not be used by stating rhetorically, "so the next logical question I think you would ask yourself is, why do you use wire services?"

(m) Cole stated that he had "spent the last three years taking FTD out of bankruptcy" in a manner intended to criticize and disparage FTD, and adversely interfere with FTD's business.

(n) Cole referred to "FTD" and other wire services as "monolithic" in a manner intended to criticize and disparage FTD, and adversely interfere with FTD's business.

82. Upon information and belief, Cole posted the Webinar in the summer of 2023 and it has been publicly available at all times since then.

*FTD Confronts Cole Regarding the Webinar and His Misconduct*

83. Upon discovering the existence of the Webinar, FTD contacted Cole to discuss the Webinar.

84. FTD started to detail the breaches that were apparent in the Webinar and, before FTD could even articulate all of them, Cole became upset and claimed that "Everything on that video is true, and if I have hurt your feelings you'll just have to deal with it."

85. Cole left no doubt that he would not have the Webinar removed from Tribute's website.

86. As of the date of this filing, the Webinar is still available online for all the world to see, which compels FTD to seek injunctive relief.

*Coles Breaches of Contract*

87.     Cole breached his Agreement, including certain of its Restrictive Covenants and Confidentiality Obligations, by engaging improper conduct, including the conduct described herein with respect to the creation and posting of the Webinar.

88.     With the benefit of hindsight, it now appears that Cole never intended to comply with his Restrictive Covenants and Confidentiality Obligations (other than his non-compete) and assurances made by Cole that he would comply were false.

89.     As a result of Cole's breaches of his Agreement, FTD's conditional agreement to forbear from enforcing Cole's non-compete obligation is null and void.

90.     As a result of Cole's breaches of his Agreement, Cole has failed to fulfill a condition of FTD's forbearance and, therefore, he is not entitled to such forbearance.

91.     Cole has been in violation of his non-compete since the day that he joined Tribute.

92.     With the benefit of hindsight, it now appears that Cole's assurances regarding sending more business to FTD were false and Cole never intended to honor his promise; to date, Cole has not directed the additional Tribute business that Cole assured FTD he would direct to FTD.

93.     FTD's investigation regarding Cole's breaches is ongoing but it now appears, with the benefit of hindsight, that Cole may have breached his contractual obligations to FTD in other ways, such as by soliciting and hiring FTD's executive-level employees.

94.     Upon information and belief, Cole on his behalf and/or on behalf of Tribute solicited or encouraged Matt Powell to leave the employment of FTD, and hired Powell to work at Tribute.

95. On or about May 19, 2023, Matt Powell, FTD's Chief Technology Officer tendered his resignation and went to work for Cole at Tribute.

96. Matt Powell was an executive-level employee of FTD prior to his departure.

97. Upon information and belief, Cole on his behalf and/or on behalf of Tribute solicited or encouraged Jamie Cresto to leave the employment of FTD, and hired Cresto to work at Tribute.

98. On or about May 26, 2023, Jaime Cresto, FTD's Director of Strategic Partnerships/Sales tendered her resignation and went to work for Cole at Tribute.

99. Jamie Cresto was an executive-level employee of FTD prior to her departure.

100. As FTD's Director of Strategic Partnerships/Sales, Ms. Cresto managed a team of direct reports (including account managers and executives), was responsible for strengthening, managing, and expanding new partnership and business opportunities, was actively involved in negotiating and signing contracts with some of FTD's largest clients, and otherwise participated in the management of the business.

101. Upon information and belief, Cole on his own his behalf and/or on behalf of Tribute solicited or encouraged Vicky Hayes to leave the employment of FTD, and hired Hayes to work at Tribute.

102. On or about May 5, 2023, Vicky Hayes, FTD's Senior Florist Account Manager resigned from FTD and went to work for Cole at Tribute.

103. Vicky Hayes was an executive-level employee of FTD prior to her departure.

104. As FTD's Senior Florist Account Manager, Ms. Hayes was responsible for maximizing key partnerships to drive florist member participation, managing florist

relationships, order fulfillment and revenue growth, and otherwise participated in the management of the business.

*Damages Allegations*

105. Each of the acts and omissions alleged herein singularly or in combination with others constitute a misappropriation of confidential information and trade secrets, breach of contract, and/or other wrongful conduct that proximately has caused or will cause FTD to suffer damages.

106. As a direct and proximate result of Cole's conduct as set forth herein, FTD has suffered and will continue suffering damages including damages from (i) the loss of customers and business partners, and the associated revenue; (ii) the loss of confidential and proprietary information; (iii) the loss of goodwill and business reputation; and (iv) present economic loss, which is uncertain at this time, and future economic loss, which is incalculable.

107. Cole's conduct as set forth herein shows willful, wanton, and outrageous misconduct. Cole acted with a specific intent to harm FTD. Accordingly, FTD seeks the imposition of punitive damages.

108. If Cole is permitted to continue the wrongs described herein, he will have profited from his wrongs, resulting in irreparable harm and immeasurable damages to FTD that are unpredictable, uncertain, and unending. Unless Cole is enjoined as requested herein, FTD will suffer further irreparable harm, to which it has no adequate remedy at law.

109. Cole has no legitimate interest in engaging in the egregious misconduct described herein.

110. The balance of the equities requires the issuance of a temporary restraining order, which is necessary to maintain the status quo immediately prior to Cole's wrongful conduct.

111. The granting of preliminary and permanent injunctive relief will restore the parties to the status quo as it existed immediately prior to Cole's wrongful conduct.

112. FTD will suffer far greater harm if the Court were to deny temporary injunctive relief, as compared to the harm that Cole would suffer if the Court grants such relief. Additionally, a temporary restraining order or preliminary injunction would not substantially harm Cole. The injunctive relief FTD seeks is reasonably suited to abate the wrongful activity described herein.

113. The activity that FTD seeks to restrain is actionable, its right to relief is clear, and the wrong is manifest. FTD is likely to prevail on the merits of its claims against Cole.

114. A temporary restraining order or preliminary injunction would not harm the public interest.

115. FTD has no fully adequate remedy at law.

**COUNT I**
**THE DEFEND TRADE SECRETS ACT – 18 U.S.C. §§ 1831-39**

116. FTD repeats and realleges the allegations set forth in paragraphs 1 through 115 above as if fully set forth herein.

117. The *Defend Trade Secrets Act* ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

118. The Confidential Information and Trade Secrets of FTD described above constitute trade secrets within the meaning of DTSA, used in, or intended for use in, interstate and commerce. Such information includes but is not limited to information regarding FTD's Return Rates and Inventory Strategies.

21

119. The FTD Confidential Information and Trade Secrets identified herein represent protectable trade secrets under the DTSA.

120. FTD has taken reasonable measures to keep its Confidential Information and Trade Secrets confidential including, but not limited to, ensuring that Cole and others with access to such information are subject to restrictive covenants and confidentiality obligations.

121. FTD has incurred and continues to incur great expense in both time and money to develop and protect the secrecy of its Confidential Information and Trade Secrets.

122. FTD's Confidential Information and Trade Secrets enable it to compete in a specialized and highly competitive market.

123. FTD has the right to the use and enjoyment of its Confidential Information Trade Secrets.

124. FTD's Confidential Information and Trade Secrets are valuable to FTD's business. FTD derives independent economic value from the Confidential Information and Trade Secrets, actual or potential, from the fact that they are not generally known to, and are not readily ascertainable through proper means by another person who can obtain economic value from their disclosure or use.

125. Cole has a duty to maintain the confidentiality of the FTD Confidential Information and Trade Secrets he learned from FTD while working for it.

126. Cole knew he had a duty to maintain the secrecy of FTD's Confidential Information and Trade Secrets due, in part, to his fiduciary duties and duties of loyalty to FTD and Cole's acknowledgement of such duties under his employment agreement.

127. Cole's actions constitute actual and/or threatened misappropriation in violation of the DTSA. Cole misappropriated FTD's Confidential Information and Trade Secrets in violation

of the DTSA by, among other things, disclosing and using FTD's trade secrets, including information regarding FTD's Return Rates and Inventory Strategies, without FTD's consent, using improper means to acquire knowledge of such information in breach of his duties and contractual obligations to FTD, knowingly obtaining such knowledge in breach of his duties and contractual obligations to FTD to maintain the secrecy of such information.

128. Cole will continue to maintain, disclose and utilize FTD's Confidential Information and Trade Secrets in the course of his employment with Tribute by using this information to unfairly compete with FTD.

129. FTD faces threatened and actual immediate and long-term, irreparable harm for which there is no adequate remedy at law if Cole is not temporarily, preliminarily and permanently enjoined from misappropriating, or threatening to misappropriate, FTD's Confidential Information and Trade Secrets.

130. As a direct and proximate result of Cole's threatened, actual or inevitable misappropriation, FTD has suffered and will continue to suffer damages, including, but not limited to, irreparable and incalculable damages from (i) the loss of customers and business partners, and the associated revenue; (ii) the loss of confidential and proprietary information; (iii) the loss of goodwill and business reputation; and (iv) present economic loss, which is uncertain at this time, and future economic loss, which is presently incalculable.

**COUNT II**
**BREACH OF CONTRACT**

131. FTD repeats and realleges the allegations set forth in paragraphs 1 through 130 above as if fully set forth herein.

132. The Agreement is an enforceable contract and supported by consideration.

133. FTD has performed all of its obligations under the Agreement.

134. The Agreement's Restrictive Covenants and Confidentiality Obligations are reasonably necessary for FTD's protection, and reasonably and narrowly tailored to protect FTD's legitimate business interests.

135. FTD does business across the United States and, as a result, the Restrictive Covenants having the territorial reach spanning the United States are reasonable.

136. The Restrictive Covenants are also reasonable because they have certain limitations or carve-outs, for example, (i) one of the covenants only prohibits working with clients and customers with whom Cole had contact during the last year of his employment with FTD; (ii) one of the covenants includes a carve-out if "such employment or services do not relate in any manner to the Business" of FTD; (iii) one of the covenants permits Cole to "engage freely with the following entities: Bounce Exchange, Conversion Path and January Digital"; and (iv) the non-disparagement clause includes a carve-out that allows Cole to "speak publicly with respect to his opinion or assessment of the general industry in which the Restricted Group sells products or services *as long as such statements do not specifically reference any member of the Restricted Group [FTD] or their respective performance or prospects*." (Ex. A, Agreement § 6(c)) (emphasis added).

137. The time period during which the Restrictive Covenants are in effect is reasonable because, among other things, (i) FTD's Confidential Information and Trade Secrets are closely guarded and valuable for at least an 18-month period; (ii) the 18-month period is narrowly tailored, as evidenced by the longer two-year period that the Agreement provides where the employee competes with a Core Competitor, as defined in the Agreement. Cole is not working for a Core Competitor and, therefore the shorter, 18-month period applies, subject to the Tolling Period.

138. The Agreement's Tolling Period, which extends the time period during which the Restrictive Covenants are in effect by the length of time during which Cole is in breach of such covenants is reasonable given that (i) the Tolling Period applies when any court of competent jurisdiction determines that a breach has occurred on FTD's application for injunctive relief; and (ii) without applying the Tolling Period, FTD would be deprived of the benefit of the Agreement during that period.

139. The Agreement's Restrictive Covenants and Confidentiality Obligations were included to protect FTD's legitimate business interests including its business relationships, confidential information and trade secrets, goodwill, and other valid and legitimate business interests.

140. The Agreement's Restrictive Covenants and Confidentiality Obligations were entered into in connection with Cole's being hired as CEO and are adequately supported by consideration given the compensation that Cole received as CEO.

141. Cole, as the highest-ranking executive of FTD, was able to access FTD's most sensitive Confidential Information and Trade Secrets, which further supports the need for FTD to impose restrictions upon his conduct.

142. Cole was employed as FTD's CEO for a three-year period, which further supports the fact that his Restrictive Covenants and Confidentiality Obligations were adequately supported by consideration.

143. In the Agreement, Cole and FTD expressly understood and agreed that the Restrictive Covenants were reasonable. (Ex. A, Agreement § 6(d)) ("Executive and the Company consider the restrictions contained in this Section 6 to be reasonable . . .").

144. By reason of the foregoing conduct, Cole has materially breached the Restrictive Covenants and Confidentiality Obligations contained in his Agreement.

145. As a result of Cole's breaches of his Agreement, FTD's conditional agreement to forbear from enforcing Cole's non-compete obligation is null and void.

146. As a result of Cole's breaches of his Agreement, Cole has failed to fulfill a condition of FTD's forbearance and, therefore, he is not entitled to such forbearance.

147. Cole has been in violation of his non-compete since the day that he joined Tribute.

148. Cole's breaches of contract were and continue to be knowing, willing, and voluntary.

149. As a direct and proximate cause of Cole's actions, FTD has suffered and will continue to suffer damages including damages from (i) the loss of customers and business partners, and the associated revenue; (ii) the loss of confidential and proprietary information; (iii) the loss of goodwill and business reputation; and (iv) present economic loss, which is uncertain at this time, and future economic loss, which is presently incalculable.

**COUNT III**
**THE ILLINOIS TRADE SECRETS ACT – 765 ILCS 1065/1 – 9**

150. FTD repeats and realleges the allegations set forth in paragraphs 1 through 149 above as if fully set forth herein.

151. The Confidential Information and Trade Secrets identified herein represent protectable trade secrets under Illinois law.

152. FTD has taken reasonable measures to keep its Confidential Information and Trade Secrets confidential including, but not limited to, ensuring that Cole and others with access to such information are subject to restrictive covenants and confidentiality obligations.

153. FTD has incurred and continues to incur great expense in both time and money to develop and protect the secrecy of its Confidential Information and Trade Secrets.

154. FTD's Confidential Information and Trade Secrets enable it to compete in a specialized and highly competitive market. FTD has the right to the use and enjoyment of its FTD Confidential Information and Trade Secrets.

155. FTD's Confidential Information and Trade Secrets are valuable to FTD's business. FTD derives independent economic value from the Confidential Information and Trade Secrets, actual or potential, from the fact that they are not generally known to, and are not readily ascertainable through proper means by another person who can obtain economic value from their disclosure or use.

156. Cole received FTD's Confidential Information and Trade Secrets from FTD, which is an entity headquartered in Chicago, Illinois.

157. The Illinois Trade Secrets Act may be applied extraterritorially to Cole's conduct outside the state of Illinois. *See, e.g., IPOX Schuster, LLC v Nikko Asset Mgt. Co., Ltd.*, 304 F.Supp.3d 746 (ND. Ill. 2018).

158. Cole misused FTD's Confidential Information and Trade Secrets because, among other reasons, he misappropriated such information and used such information in the conduct of business.

159. FTD faces threatened and actual immediate and long-term, irreparable harm for which there is no adequate remedy at law if Cole is not temporarily, preliminarily and permanently enjoined from misappropriating, or threatening to misappropriate, FTD's Confidential Information and Trade Secrets.

160.    As a direct and proximate result of Cole's threatened, actual or inevitable misappropriation, FTD has suffered and will continue to suffer damages, including, but not limited to, irreparable and incalculable damages from (i) the loss of customers and business partners, and the associated revenue; (ii) the loss of confidential and proprietary information; (iii) the loss of goodwill and business reputation; and (iv) present economic loss, which is uncertain at this time, and future economic loss, which is presently incalculable.

## RELIEF SOUGHT FOR ALL COUNTS

WHEREFORE, FTD respectfully requests that the Court enter judgment in its favor on Counts I, II, and II and grant it the following relief:

1) Enter a temporary restraining order prohibiting Defendant Cole from engaging in the following conduct until a decision on FTD's request for preliminary injunctive relief is rendered by the Court:

   a) posting or making available to the public or any third-party the Webinar that is currently available online at https://www.tributetech.com/floral-webinar-video;

   b) disclosing, using, or misappropriating FTD confidential information and trade secrets;

   c) maintaining in his personal possession any documents, whether originals or copies, that contain FTD's confidential information; all such documents shall be deposited by Cole with his outside counsel who agrees to maintain them securely in escrow or, alternatively, shall be returned to FTD's counsel immediately;

   d) making, or causing any other person to make, any communication that (i) references FTD by name or implication, and (ii) criticizes, disparages, or adversely interferes with FTD or its business relationships or attempts to do so.

2) Enter a preliminary and permanent injunction, prohibiting Defendant Cole from:

a) posting or making available to the public or any third-party the Webinar that is currently available online at https://www.tributetech.com/floral-webinar-video;

b) disclosing, using, or misappropriating FTD Confidential Information and Trade Secrets;

c) maintaining in his personal possession any documents, whether originals or copies, that contain FTD's confidential information; all such documents shall be deposited by Cole with his outside counsel who agrees to maintain them securely in escrow or, alternatively shall be returned to FTD's counsel immediately;

d) engaging in the conduct described in subsections (i) through (vi) below for an eighteen-month period commencing the date on which Cole begins complying with such order, which period shall be extended by the length of time during which Cole violates such order or the restrictions in Section 6 of his Employment Agreement with FTD as determined by any court of competent jurisdiction:

   (i)  soliciting, or assisting in solicitation, in competition anywhere in the United States with FTD or its subsidiaries and, to the extent engaged in the Business (defined below), their respective affiliates (including Nexus Capital Management LP and its affiliates) (the "Restricted Group"); "Business" means any business or enterprise that, directly or indirectly (including through an affiliate or franchisees) provides or is engaged in the floral business anywhere in the world in a manner that is competitive with the business, activities, products or services of the type conducted, offered, or provided by FTD or any of its subsidiaries;

   (ii)  acquiring a financial interest in, or otherwise become actively involved with, any person or entity engaged in the Business of the Restricted Group;

(iii)    adversely interfering with, or attempting to adversely interfere with, business relationships between the Restricted Group and any of its clients, customers, suppliers, partners, equity holders or investors;

(iv)    directly or indirectly soliciting or encouraging any employees of the Restricted Group to leave their employment with FTD;

(v)    directly or indirectly hiring any executive-level employee who was employed by the Restricted Group as of March 1, 2023 (the date of Cole's termination of employment with FTD) or who left the employment with FTD coincident with, or within six months prior to or six months after, March 1, 2023; and

(vi)    making, or causing any other person to make, any communication that is intended to criticize or disparage, or has the effect of criticizing or disparaging FTD or any of its affiliates, agents, advisors, officers, directors or employees (except that Cole may speak publicly with respect to his opinion or assessment of the general industry in which the Restrictive Group sells products or services as long as such statements do not specifically reference any member of the Restricted Group or their respective performance or prospects);

3)  Enter an order on FTD's application for preliminary and permanent injunctive relief finding that Cole breached Section 6 of his Employment Agreement (containing Cole's restrictive covenants) and, accordingly, extending the period of time during which the provisions of Section 6 shall be in effect by the length of time during which Cole was in breach;

4)  An order awarding FTD its damages;

5)  An award of punitive damages in an amount to be determined at trial;

6)  An award of FTD' attorneys' fees and litigation costs; and

30

7)  Granting such further relief as is just and appropriate under the circumstances.

Dated:  February 5, 2024

                                        Respectfully Submitted,


                                        By:    */s/ Douglas A. Albritton*
                                         Douglas A. Albritton (ARDC 6228734)
                                        Actuate Law LLC
                                        641 West Lake Street, 5th Floor
                                        Chicago, IL 60661
                                        (312) 579-3131 (Albritton direct) or
                                        (312) 579-3108 (General)
                                        doug.albritton@actuatelaw.com


                                        ZUKERMAN GORE BRANDEIS
                                           & CROSSMAN, LLP
                                        John K. Crossman (Pro Hac Vice Pending)
                                        Jesenia Ruiz de la Torre (Pro Hac Vice Pending)
                                        Eleven Times Square
                                        New York, New York 10036
                                        Telephone: (212) 223-6700
                                        Facsimile: (212) 223-6433
                                        jcrossman@zukermangore.com
                                        jruiz@zukermangore.com

                                        *Attorneys for Plaintiff FTD, LLC*

31