# Exhibit A

**EMPLOYMENT AGREEMENT**
**(Charlie Cole)**

EMPLOYMENT AGREEMENT (the "Agreement"), dated March 18, 2020 by and between FTD, LLC, a Delaware limited liability company (the "Company"), and Charlie Cole ("Executive").

The Company desires to employ Executive and Executive desires to accept such employment; and

The Company and Executive desire to enter into an agreement embodying the terms of such employment.

In consideration of the premises and mutual covenants herein and for other good and valuable consideration, the parties agree as follows:

1.      Term of Employment. Subject to the provisions of **Section 5** of this Agreement, Executive shall be employed by the Company for a period commencing on March 30, 2020 (or such earlier date as Executive and the Company mutually agree upon) (the "Effective Date") and shall remain employed until Executive's employment is terminated pursuant to **Section 5**. The period during which Executive is employed is referred to herein as the "Employment Term".

2.      Position, Duties and Authority.

(a)      During the Employment Term, Executive shall serve as the Company's Chief Executive Officer. In such position, Executive shall have such duties, functions, responsibilities and authority as shall be determined from time to time by the Board of Directors (the "Board") of Gateway Mercury Holdings Parent, LLC, a Delaware limited liability company and the indirect parent of the Company ("Parent"), and be consistent with the duties, functions, responsibilities and authority of a Chief Executive Officer at a portfolio company of a private equity firm. Executive shall report directly to the Board. If requested by the Board, Executive shall also serve as a member of the Board without additional compensation.

(b)      Executive will devote substantially all of Executive's business time and reasonable best efforts to the operation and oversight of the Company's businesses and performance of Executive's duties hereunder (excluding periods of vacation and sick leave) and will not engage in any other business activities that could conflict with his duties or services to the Company; provided that nothing herein shall preclude Executive, subject to obtaining consent of the Board (not to be unreasonably withheld), from (i) serving as an officer or director of, or otherwise participating in, non-profit educational, welfare, social, religious and civil organizations, or (ii) serving as an advisor or board member of a for-profit entity that does not engage, and whose affiliates do not engage, in each case, directly or indirectly in the Business (as defined below). Notwithstanding anything else in this Agreement, the parties agree that nothing shall restrict Executive from providing advisory services to the entities listed on Attachment 1 attached hereto.

3.      Compensation.

(a)      Base Salary.                    REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

5.  Termination.

(a)  The Employment Term and Executive's employment hereunder may be terminated by either party at any time and for any reason, subject to the notice and cure provisions set forth below. Notwithstanding any other provision of this Agreement, the provisions of this **Section 5** shall exclusively govern Executive's rights upon termination of employment with the Company.

(b)  By the Company for Cause or by Executive other than as a result of Good Reason.

(i)  The Employment Term and Executive's employment hereunder may be terminated by the Company for Cause and shall terminate automatically upon the effective date of Executive's resignation other than as a result of Good Reason.

(ii)  *Definition of Cause*.  For purposes of this Agreement, "Cause" shall mean (A) Executive's continued refusal to perform Executive's employment duties (other than as a result of total or partial incapacity due to physical or mental illness) for a period of ten (10) business days following written notice by the Company to Executive of such refusal, (B) dishonesty in the performance of Executive's employment duties that results or is reasonably expected to result in a material injury to the Company or any of its affiliates or subsidiaries, (C) an act or acts on Executive's part constituting (x) a felony charge under the laws of the United States or any state thereof or (y) a misdemeanor charge involving moral turpitude, (D) Executive's willful malfeasance or willful misconduct in connection with Executive's employment duties which causes or is reasonably expected to cause a material injury to the financial condition or business reputation of the Company or any of its subsidiaries or affiliates, (E) Executive's material breach of any of the covenants set forth in **Section 6** or **Section 7**, or (F) Executive's material breach of any written policy of the Company applicable to Executive; provided that none of the foregoing events shall constitute Cause unless Executive fails to cure such event and remedy any adverse or injurious consequences arising from such events within thirty (30) days after receipt from the Company of written notice (which may be delivered via electronic mail and must specifically reference this **Section 5(b)(ii)**) of the event which constitutes Cause (except that no cure or remedy period shall be provided (I) if the event or such consequences are not capable of being cured and remedied or (II) in the event of more than one event or consequence of substantially the same kind, other than with respect to the first such event or consequence).

(iii)  If Executive's employment is terminated by the Company for Cause, Executive shall be entitled to receive:

(A)  no later than five (5) business days following the date of termination, the Base Salary through the date of termination;

(B)  any Annual Bonus earned, but unpaid, as of the date of termination for the immediately preceding fiscal year, paid in accordance with **Section 3(c)** (except to the extent payment is otherwise deferred pursuant to any applicable deferred compensation arrangement with the Company, in which case such payment shall be made in accordance with the terms and conditions of such deferred compensation arrangement);

(C)  reimbursement, within forty-five (45) days following receipt by the Company of Executive's claim for such reimbursement (including appropriate supporting documentation), for any unreimbursed business expenses properly incurred by Executive in accordance with Company policy prior to Executive's termination; provided

that such claims for such reimbursement are submitted to the Company within 90 days following the date of Executive's termination of employment; and

(D)      such Employee Benefits, if any, as to which Executive may be entitled under the tax qualified employee benefit plans of the Company, payable in accordance with the terms and conditions of such tax qualified employee benefit plans (the amounts described in clauses (A) through (D) hereof being referred to as the "Accrued Rights").

Following such termination of Executive's employment by the Company for Cause, except as set forth in this **Section 5(b)(iii)**, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(iv)      If Executive resigns other than as a result of Good Reason, (A) Executive will be required to give the Company at least forty-five (45) days advance written notice of any resignation of Executive's employment, (B) Executive shall be entitled to receive the Accrued Rights, and (C) following such resignation and except as set forth in this **Section 5(b)(iv)**, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(c)      <u>Disability or Death</u>.

(i)      *Disability.*  During any period that Executive fails to perform his duties hereunder as a result of incapacity due to physical or mental illness or injury, Executive shall continue to receive his full Base Salary until his employment is terminated pursuant to **Section 5(a)**.  For purposes of this Agreement, "<u>Disability</u>" shall mean Executive's inability to perform, with or without reasonable accommodation, Executive's duties under this Agreement due to a physical or mental illness or injury for a period of 90 consecutive days or for an aggregate of 120 days in any consecutive 240-day period.  Any question as to the existence of the Disability of Executive as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company.  If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third physician who shall make such determination in writing.  The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of this Agreement.

(ii)      Upon termination of Executive's employment hereunder for either Disability or death, Executive or Executive's estate, survivors or beneficiaries (as the case may be) shall be entitled to receive the Accrued Rights and death or disability benefits under any applicable plans and programs of the Company in accordance with the terms and provisions of such plans and programs.

(d)      <u>By the Company Without Cause or Resignation by Executive as a Result of Good Reason</u>.

(i)      "<u>Good Reason</u>" shall be deemed to exist upon the occurrence of (A) a material reduction in Executive's Base Salary or Bonus Target Percentage (except as part of an across-the-board compensation reduction that applies in the same manner to all senior executives of the Company); (B) a material diminution in Executive's title or Executive's duties, authority and responsibilities measured in the aggregate; (C) the relocation of Executive's primary office location to a location that is more than thirty-five (35) miles from Executive's primary office location

8

without Executive's prior written consent, which must specifically reference this **Section 5(d)(i)**; or (D) the Company's material breach of any of the provisions of this Agreement; <u>provided</u> that none of the foregoing events shall constitute Good Reason unless the Company fails to cure such event within thirty (30) days after receipt from Executive of written notice of the event which constitutes Good Reason; and <u>provided</u>, <u>further</u>, that "Good Reason" shall cease to exist for an event on the seventy-fifth (75th) day following the later of its occurrence or Executive's knowledge thereof, unless Executive has given the Company written notice thereof (which may be delivered via electronic mail) prior to such date.

(ii)   If Executive's employment is terminated by the Company (other than by reason of death or Disability) without Cause (for which the Company shall provide Executive with at least forty-five (45) days prior written notice or, in lieu of such notice, provide Executive with an additional forty-five (45) days of Base Salary (in addition to any other payments owed to Executive pursuant to this paragraph) and terminate Executive immediately) or Executive resigns as a result of Good Reason, Executive shall be entitled to receive:

(A)   the Accrued Rights, and

(B)   subject to Executive's continued compliance with **Section 6** and material compliance with **Section 7** hereof, and the execution and non-revocation of the Release (as defined below),

(x)   continued Base Salary for one (1) year following the date of termination of Executive's employment, payable in equal installments in accordance with the Company's normal payroll practices, and first payable within fifteen (15) business days following the effectiveness of the Release,

(y)   provided that such termination or resignation occurs after the first (1st) anniversary of the Effective Date, a pro rata portion of the Annual Bonus payable for the fiscal year in which such termination occurs, based on multiplying (I) a fraction, the numerator of which is the number of days during the fiscal year up to and including the date of termination of Executive's employment and the denominator of which is the number of days in such fiscal year, by (II) the Annual Bonus, if any, paid or payable for the preceding fiscal year, *provided, however*, that if Executive is terminated after the first (1st) anniversary of the Effective Date and before July 1, 2021, then the Annual Bonus for purposes of this clause (II) shall equal the Bonus Target Amount, and

(z)   if Executive elects health care continuation coverage under Section 4980B of the Code and Section 601 of the Employee Retirement Income Security Act of 1974, as amended (which provisions are commonly known as COBRA), payment of all premiums for COBRA coverage for a period of twelve (12) months (or until Executive is eligible for other group health coverage through a subsequent employer, it being understood that Executive shall promptly notify Company of such eligibility), beginning with the month following the month in which the termination date occurs.

(e)   <u>Release</u>.  Amounts payable to Executive under **Section 5(d)(ii)(B)** (collectively, the "<u>Conditioned Benefits</u>") are subject to (i) Executive's execution and non-revocation of a release of claims, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Release</u>"), within sixty (60) days of the date of termination and (ii) the expiration of any revocation period contained in such Release.  Further, to

9

the extent that any of the Conditioned Benefits constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), any payment of any amount or provision of any benefit otherwise scheduled to occur prior to the sixtieth (60th) day following the date of Executive's termination of employment hereunder, but for the condition on executing the Release as set forth herein, shall not be made until the first regularly scheduled payroll date following such sixtieth (60th) day, after which any remaining Conditioned Benefits shall thereafter be provided to Executive according to the applicable schedule set forth herein.

(f)     Expiration of Employment Term.  Unless the parties otherwise agree in writing, continuation of Executive's employment with the Company following the expiration of the Employment Term shall be deemed an employment at-will and shall not be deemed to extend any of the provisions of this Agreement and Executive's employment may thereafter be terminated at will by either Executive or the Company; provided that the provisions of **Sections 6** and **7** (except as otherwise set forth in **Section 7(a)(iii)**) and **8** of this Agreement shall survive any termination of this Agreement or Executive's termination of employment hereunder.

(g)     Notice of Termination; Board/Committee Resignation.  Any purported termination of employment by the Company or by Executive (other than due to Executive's death) pursuant to **Section 5** of this Agreement shall be communicated by written Notice of Termination to the other party hereto.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice (which may be delivered via electronic mail) which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated.  Upon termination of Executive's employment for any reason, Executive agrees to resign, as of the date of such termination and to the extent applicable, from the Board (and any committees thereof) and the Board of Directors (and any committees thereof) of any of the Company's affiliates.

6.     Non-Competition; Non-Solicitation.  Executive acknowledges and recognizes the highly competitive nature of the Business (as defined below) and accordingly agrees as follows:

(a)     Non-Competition.

(i)     During the Employment Term and for eighteen (18) months thereafter (the "Restricted Period"), Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever ("Person"), directly or indirectly, solicit or assist in soliciting in competition with the Restricted Group (as defined below) in the Business, the business of any then-current or prospective client or customer with whom Executive (or Executive's direct reports) had personal contact on behalf of the Company during the one (1)-year period immediately preceding Executive's termination of employment.

(ii)     During the Restricted Period, Executive will not directly or indirectly:

(A)     engage in the Business anywhere in the United States, or in any other country where the Restricted Group engages in the Business and derives not less than 20% of its revenue as of the last day of the Employment Term, including, for the avoidance of doubt, by entering into the employment of or rending any services to a Core Competitor, except where such employment or services do not relate in any manner to the Business;

10

(B)      acquire a financial interest in, or otherwise become actively involved with, any Person engaged in the Business, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant; or

(C)      intentionally and adversely interfere with, or attempt to adversely interfere with, business relationships between the members of the Restricted Group and any of their clients, customers, suppliers, partners, equityholders or investors; *provided, however*, that nothing in this Agreement shall restrict Executive's ability to engage freely with the following entities: Bounce Exchange, Conversion Path and January Digital.

(iii)      Notwithstanding anything to the contrary in this Agreement, Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in a Business (including, without limitation, a Core Competitor) which are publicly traded on a national or regional stock exchange or on the over-the-counter market if Executive (A) is not a controlling person of, or a member of a group which controls, such person and (B) does not, directly or indirectly, own 2% or more of any class of securities of such Person.

(iv)      Notwithstanding **Section 6(a)(i)**, the Restricted Period shall be two (2) years with respect to any activities prohibited by **Section 6(a)(ii)(A)** or **(B)** as they relate to a Core Competitor.

(b)      <u>Non-Solicitation</u>.  During Executive's employment hereunder and the Restricted Period, Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any Person, directly or indirectly:

(i)      solicit or encourage any employee, including executive-level employees, of the Restricted Group to leave the employment of the Restricted Group;

(ii)      hire any executive-level employee who was employed by the Restricted Group as of the date of Executive's termination of employment with the Company or who left the employment of the Restricted Group coincident with, or within six months prior to or six months after, the date of Executive's termination of employment with the Company; or

(iii)      encourage any material consultant of the Restricted Group to cease working with the Restricted Group.

For clarity, nothing in this **Section 6(b)** shall restrict Executive from hiring a former employee of the Company or the Restricted Group who was terminated by the Company or the Restricted Group.

(iv)      For purposes of this Agreement:

(A)      "<u>Restricted Group</u>" shall mean, collectively, the Company and its subsidiaries and, to the extent engaged in the Business, their respective affiliates (including Nexus Capital Management LP and its affiliates).

(B)      "<u>Business</u>" shall mean any business or enterprise that, directly or indirectly (including through an affiliate or franchisees) provides or is engaged in the floral business anywhere in the world in a manner that is competitive with the business, activities, products or services of the type conducted, offered, or provided by the Company or any of its subsidiaries, or with respect to which (y) the Company or any of its subsidiaries has

11

spent significant time or resources analyzing, during the Employment Term, for the purpose of expanding the Company's offerings, and (z) the Company or any of its subsidiaries intends to offer to consumers at some point during the Restricted Period.

(C) "Core Competitor" shall mean 1-800-Flowers, Teleflora, FromYouFlowers, Bouqs, Flower.com, SendFlowers.com, Amazon.com, LLC's consumer flower business, VivaRoses, UrbanStems, Flowerbx, Ava's Flowers and any of their respective affiliates that are engaged in the Business.

(c)     During the Restricted Period, Executive agrees not to make, or cause any other person to make, any communication that is intended to criticize or disparage, or has the effect of criticizing or disparaging, the Company or any of its affiliates, agents or advisors (or any of its or their respective employees, officers or directors (it being understood that comments made in Executive's good faith performance of his duties hereunder shall not be deemed disparaging or defamatory for purposes of this Agreement)). Nothing set forth herein shall be interpreted to prohibit Executive from responding truthfully to incorrect public statements, making truthful statements when required by law, subpoena or court order and/or from responding to any inquiry by any regulatory or investigatory organization. Notwithstanding anything else in this Agreement, nothing shall restrict Executive's ability to speak publicly with respect to his opinion or assessment of the general industry in which the Restricted Group sells products or services as long as such statements do not specifically reference any member of the Restricted Group or their respective performance or prospects.

(d)     It is expressly understood and agreed that although Executive and the Company consider the restrictions contained in this **Section 6** to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this **Section 6** is an unenforceable restriction against Executive, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this **Section 6** is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

(e)     The period of time during which the provisions of this **Section 6** shall be in effect shall be extended by the length of time during which Executive is in breach of the terms hereof as determined by any court of competent jurisdiction on the Company's application for injunctive relief.

7.     Confidentiality; Intellectual Property.

(a)     Confidentiality.

(i)     Without the prior written authorization of the Board, Executive will not at any time (whether during or after Executive's employment with the Company), (x) retain or use for the benefit, purposes or account of Executive or any other Person; or (y) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside the Company (other than Executive's professional advisers who are bound by confidentiality obligations or otherwise in performance of Executive's duties under Executive's employment and pursuant to customary industry practice), any non-public, proprietary or confidential information of the Company or its subsidiaries – including, without limitation, trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training,

12

advertising, sales, marketing, promotions, government and regulatory activities and approvals – concerning the past, current or future business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to the Company on a confidential basis (collectively, the "Confidential Information").

(ii)     "Confidential Information" shall not include any information that is (A) generally known to the industry or the public other than as a result of Executive's breach of this covenant; (B) made legitimately available to Executive by a third party without breach of any confidentiality obligation of which Executive has knowledge; (C) known by Executive prior to disclosure by the Company (or its subsidiaries or affiliates), as demonstrated by contemporaneous documentation; (D) independently developed by Executive without use of or reliance upon any Confidential Information, as demonstrated by contemporaneous documentation; or (E) required by law to be disclosed; provided that with respect to subsection (E) Executive shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and reasonably cooperate with any attempts by the Company to obtain a protective order or similar treatment.

(iii)     Except as required by law, Executive will not disclose to anyone, other than Executive's family (it being understood that, in this Agreement, the term "family" refers to Executive, Executive's spouse, children, parents and spouse's parents) and advisors, the existence or contents of this Agreement; provided that Executive may disclose to any prospective future employer the provisions of **Sections 6** and **7** of this Agreement.  This **Section 7(a)(iii)** shall terminate if the Company publicly discloses a copy of this Agreement (or, if the Company publicly discloses summaries or excerpts of this Agreement, to the extent so disclosed).

(iv)     Upon termination of Executive's employment with the Company for any reason, Executive shall (A) cease and not thereafter commence use of any Confidential Information or intellectual property (including without limitation, any patent, invention, copyright, trade secret, trademark, trade name, logo, domain name or other source indicator) owned or used by the Company, its subsidiaries or affiliates; and (B) immediately destroy, delete, or return to the Company, at the Company's option, all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters and other data) in Executive's possession or control (including any of the foregoing stored or located in Executive's office, home, laptop or other computer, whether or not Company property) that contain Confidential Information, except that Executive may retain only those portions of any personal notes, notebooks and diaries that do not contain any Confidential Information.

(v)     Nothing in this Agreement, including the obligations set forth herein, restricts or prohibits Executive from initiating communications directly with, responding to any inquiries from, providing testimony before, providing confidential information to, reporting possible violations of law or regulation to, or from filing a claim or assisting with an investigation directly with a self-regulatory authority or a government agency or entity, including the U.S. Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General (collectively, the "Regulators"), or from making other disclosures that are protected under the whistleblower provisions of state or federal law or regulation.  Executive does not need the prior authorization of the Company to engage in such communications with the Regulators, respond to such inquiries from the Regulators, provide confidential information or documents to the Regulators, or make any such reports or disclosures to the Regulators.  Executive is not required to notify the Company that Executive has engaged in such communications with the Regulators.  Executive is hereby notified that federal law provides criminal and civil immunity to

13

federal and state claims for trade secret misappropriation to individuals who disclose a trade secret to their attorney, a court, or a government official in certain, confidential circumstances that are set forth at 18 U.S.C. §§ 1833(b)(1) and 1833(b)(2), related to the reporting or investigation of a suspected violation of the law, or in connection with a lawsuit for retaliation for reporting a suspected violation of the law. Nothing in this Agreement is intended to limit any rights under such federal law. Executive may also disclose the factual information related to a claim filed in a civil action or a complaint filed in an administrative action regarding sexual assault, sexual harassment, workplace harassment or discrimination based on sex, failure to prevent an act of workplace harassment or discrimination based on sex or an act of retaliation against a person for reporting harassment or discrimination based on sex.

(b)     Intellectual Property.

(i)      If Executive creates, invents, designs, develops, contributes to or improves any works of authorship, inventions, intellectual property, materials, documents or other work product (including without limitation, research, reports, software, databases, systems, applications, presentations, textual works, content, or audiovisual materials) ("Works"), either alone or with third parties, at any time during Executive's employment by the Company and within the scope of such employment and/or with the use of any the Company resources ("Company Works"), Executive shall promptly and fully disclose same to the Company and hereby irrevocably assigns, transfers and conveys, to the maximum extent permitted by applicable law, all of Executive's right, title, and interest therein (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition, other intellectual property laws, and related laws) to the Company to the extent ownership of any such rights does not vest originally in the Company. If Executive creates any written records (in the form of notes, sketches, drawings, or any other tangible form or media) of any Company Works, Executive will keep and maintain same. The records will be available to and remain the sole property and intellectual property of the Company at all times.

(ii)     Executive shall take all requested actions and execute all requested documents (including any licenses or assignments required by a government contract) at the Company's expense (but without further remuneration) to assist the Company in validating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of the Company's rights in the Company Works. If Executive is unwilling or unable for any reason to sign any document for this purpose, then Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney in fact, such appointment to be a right coupled with an interest and non-revocable, to act for and on Executive's behalf and stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(iii)    Executive shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with the Company any confidential, proprietary or non-public information or intellectual property relating to a former employer or other third party without the prior written permission of such third party. Executive shall comply with all relevant policies and guidelines of the Company that are from time to time previously disclosed to Executive, including regarding the protection of Confidential Information and intellectual property and potential conflicts of interest.

8.      Specific Performance. Executive acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of **Section 6** and **Section 7** of this Agreement may be inadequate and the Company may suffer irreparable damages as a result of such breach or threatened breach. In recognition of this fact, Executive agrees that, in the event of such a breach or

threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled, in addition to any other remedy available at law or equity, to cease making any payments or providing any benefit otherwise required by this Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.  Any determination under this **Section 8** of whether Executive is in compliance with **Section 6** hereof and material compliance with **Section 7** hereof shall be determined based solely on the contractual provisions provided therein and the facts and circumstances of Executive's actions without regard to whether the Company could obtain an injunction or other relief under the law of any particular jurisdiction.

     9.      <u>Miscellaneous</u>.

     (a)      <u>Indemnification</u>.  The Company shall indemnify and hold Executive harmless for all acts and omissions occurring during his employment with the Company or service as a member of the Board to the extent provided under Parent's operating agreement and applicable law, and shall promptly advance to Executive or Executive's heirs or representatives all damages, costs, liabilities, losses and expenses (including reasonable attorneys' fees and expenses) (collectively, "<u>Expenses</u>") as a result of any claim, demand, request, investigation, dispute, controversy, threat, discovery request or request for testimony or information (collectively, a "<u>Claim</u>") or any proceeding (whether civil, criminal, administrative or investigative), or any threatened Claim or proceeding (whether civil, criminal, administrative or investigative), against Executive that arises out of or relates to Executive's service as an officer, director or employee, as the case may be, of the Company, or Executive's service in any such capacity or similar capacity with an affiliate of the Company or other entity at the request of the Company, upon receipt by the Company of a written request with appropriate documentation of such Expenses, and an undertaking by Executive to repay the amount advanced if it shall ultimately be determined that Executive is not entitled to be indemnified by the Company against such Expenses.  The Company shall maintain directors and officers (D&O) liability insurance with customary coverages and limits sufficient to fulfill all of its obligations in this **Section 9(a)**.

     (b)      <u>Legal Fees</u>. Within thirty (30) days of the Effective Date, the Company shall reimburse Executive for any and all attorneys' and tax advisor fees and related costs actually incurred and paid in connection with his negotiation and execution of this Agreement and any equity-related agreements provided to Executive prior to the Effective Date, up to a maximum amount of $15,000.

     (c)      <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of laws principles thereof.

     (d)      <u>Jurisdiction; Venue</u>.  Except as otherwise provided in **Section 8** in connection with equitable remedies, each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any federal court sitting in the Northern District of Illinois or any state court in Cook or DuPage counties over any suit, action or proceeding arising out of or relating to this Agreement and each of the parties agrees that any action relating in any way to this Agreement must be commenced only in the courts of the State of Illinois, federal or state.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted or not prohibited by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum.  Each of the parties hereto hereby irrevocably consents to the service of process in any suit, action or proceeding by sending the same by certified mail, return receipt requested, or by recognized overnight courier service, to the address of such party set forth in **Section 9(j)**.

15

DocuSign Envelope ID: 5C90044A-851E-4DFF-AF37-87264B75A620

(e)      Entire Agreement; Amendments.  This Agreement (including, without limitation, the schedules and exhibits attached hereto) contains the entire understanding of the parties with respect to the employment of Executive by the Company, and supersedes all prior agreements and understandings (including verbal agreements) between Executive and the Company and/or its current or former affiliates regarding the terms and conditions of Executive's employment with the Company and/or its current or former affiliates.  There are no restrictions, agreements, promises, warranties, covenants or undertakings between the parties with respect to the subject matter herein other than those expressly set forth herein.  This Agreement (including, without limitation, the schedules and exhibits attached hereto) may not be altered, modified, or amended except by written instrument signed by the parties hereto.

(f)      No Waiver.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(g)      Severability.  In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

(h)      Assignment.  This Agreement, and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive.  Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void *ab initio* and of no force and effect.  This Agreement shall be assigned by the Company to a person or entity which is a successor in interest ("Successor") to substantially all of the business operations of the Company.  Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such affiliate or successor person or entity.

(i)      Compliance with Code Section 409A.

(i)      The intent of the parties is that payments and benefits under this Agreement comply with or be exempt from Code Section 409A and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.  If any provision of this Agreement (or of any award of compensation, including equity compensation or benefits) would cause Executive to incur any additional tax or interest under Code Section 409A, the Company shall, after consulting with and receiving the approval of Executive, reform such provision in a manner intended to avoid the incurrence by Executive of any such additional tax or interest.

(ii)      A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits that are considered nonqualified deferred compensation under Code Section 409A upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A, and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." The determination of whether and when a separation from service has occurred for proposes of this Agreement shall be made in accordance with the presumptions set forth in Section 1.409A-1(h) of the Treasury Regulations.

(iii)      Any provision of this Agreement to the contrary notwithstanding, if at the time of Executive's separation from service, the Company determines that Executive is a "specified employee," within the meaning of Code Section 409A, then to the extent any payment or benefit that Executive becomes entitled to under this Agreement on account of such separation from service

16

DocuSign Envelope ID: 5C90044A-851E-4DFF-AF37-87264B75A620

would be considered nonqualified deferred compensation under Code Section 409A, such payment or benefit shall be paid or provided at the date which is the earlier of (i) six (6) months and one day after such separation from service and (ii) the date of Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this **Section 9(i)** (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or provided to Executive in a lump-sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iv)     Any reimbursements and in-kind benefits provided under this Agreement that constitute deferred compensation within the meaning of Code Section 409A shall be made or provided in accordance with the requirements of Code Section 409A, including that (A) in no event shall any fees, expenses or other amounts eligible to be reimbursed by the Company under this Agreement be paid later than the last day of the calendar year next following the calendar year in which the applicable fees, expenses or other amounts were incurred; (B) the amount of expenses eligible for reimbursement, or in-kind benefits that the Company is obligated to pay or provide, in any given calendar year shall not affect the expenses that the Company is obligated to reimburse, or the in-kind benefits that the Company is obligated to pay or provide, in any other calendar year, provided that the foregoing clause (B) shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect; and (C) Executive's right to have the Company pay or provide such reimbursements and in-kind benefits may not be liquidated or exchanged for any other benefit.

(v)     For purposes of Code Section 409A, Executive's right to receive any installment payments shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days (for example, "payment shall be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company. In no event may Executive, directly or indirectly, designate the calendar year of any payment to be made under this Agreement, to the extent such payment is subject to Code Section 409A.

(j)     Notice.  For the purpose of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt; *provided, however*, that delivery of a notice or communication via electronic mail shall be permitted to the extent expressly agreed upon in this Agreement.

If to the Company:

FTD, LLC
3113 Woodcreek Rd.
Downers Grove, IL 60515
Attention:  General Counsel
Email:  slevin@ftdi.com

with a copy (which shall not constitute notice) to:

17

DocuSign Envelope ID: 5C90044A-851E-4DEF-AF37-87264B75A620

Nexus Capital Management LP
11100 Santa Monica Boulevard
Suite 250
Los Angeles, California 90025
Attention: Damian Giangiacomo
Email: damian@nexuslp.com

If to Executive:

To the most recent address of Executive set forth in the personnel records of the Company.

(k)     Executive Representation. Executive hereby represents to the Company that the execution and delivery of this Agreement by Executive and the performance by Executive of Executive's duties hereunder shall not constitute a breach of the terms of any employment agreement or other agreement or written policy to which Executive is a party or otherwise bound. Executive hereby further represents that he is not subject to any restrictions on his ability to solicit, hire or engage any employee or other service-provider. Executive agrees that the Company is relying on the foregoing representations in entering into this Agreement and related equity-based award agreements.

(l)     Withholding Taxes. The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(m)     Counterparts. This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

[*signature page follows*]

18

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

FTD, LLC

By:   Damian J. Giangiacomo
Title;        President

EXECUTIVE

Charlie Cole

19

DocuSign Envelope ID: 5C90044A-851E-4DEF-AF37-87264B75A620

**Attachment 1**

## <u>LIST OF ADVISORY POSITIONS</u>

- Mulberry (https://getmulberry.com/)
- SmartGift (smartgiftit.com)
- Nok Brands (https://www.nokbrands.com/)
- DribbleUp (https://dribbleup.com/)
- Funoogles (https://www.funoogles.com/)
- Shipsi (https://www.shipsi.com/)
- Vouched (https://www.vouched.id/)
- Snowe (https://snowehome.com/)
- Fenix Commerce (https://fenixcommerce.com/)
- Motherly (https://www.mother.ly/)

010395-1305-13471-Active.13436661.5

**Exhibit I**

**RELEASE AND WAIVER OF CLAIMS**

This Release and Waiver of Claims ("Release") is entered into and delivered to FTD, LLC (the "Company") as of this [●] day of _____, 20[__], by Charlie Cole (the "Executive"). The Executive agrees as follows:

1.      The employment relationship between the Executive and the Company and its subsidiaries and affiliates, as applicable, terminated on the [●] day of _____, 20[__] (the "Termination Date") pursuant to Section [__] of the Employment Agreement between the Company and Executive dated March [__], 2020 ("Employment Agreement").

2.      In consideration of the payments, rights and benefits provided for in Section 5(d)(ii)(B) of the Employment Agreement (collectively, as applicable, the "Separation Terms") and this Release, the sufficiency of which the Executive hereby acknowledges, the Executive, on behalf of himself and his agents, representatives, attorneys, administrators, heirs, executors and assigns (collectively, the "Employee Releasing Parties"), hereby releases and forever discharges the Company Released Parties (as defined below), from all claims, charges, causes of action, obligations, expenses, damages of any kind (including attorneys' fees and costs actually incurred) or demands, in law or in equity, whether known or unknown, which may have existed or which may now exist from the beginning of time to the date of this Release, arising from or relating to Executive's employment or termination from employment with the Company or otherwise, including a release of any rights or claims the Executive may have under Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended ("ADEA"); the Older Workers Benefit Protection Act; the Americans with Disabilities Act of 1990; the Rehabilitation Act of 1973; the Family and Medical Leave Act of 1993; Section 1981 of the Civil Rights Act of 1866; Section 1985(3) of the Civil Rights Act of 1871; the Employee Retirement Income Security Act of 1974; the Fair Labor Standards Act; [the Illinois Human Rights Act (IHRA), the Right to Privacy in the Workplace Act, the Illinois Occupational Safety and Health Act, the Illinois Worker Adjustment and Retraining Notification Act, the Illinois One Day Rest in Seven Act, the Illinois Union Employee Health and Benefits Protection Act, the Illinois Employment Contract Act, the Illinois Labor Dispute Act, the Victims' Economic Security and Safety Act, the Illinois Whistleblower Act, the Illinois Equal Pay Act, the Illinois Constitution], any other federal, state or local laws against discrimination; or any other federal, state, or local statute, regulation or common law relating to employment, wages, hours, or any other terms and conditions of employment. This includes a release by the Executive of any and all claims or rights arising under contract (whether written or oral, express or implied), covenant, public policy, tort or otherwise. For purposes hereof, "Company Released Parties" shall mean the Company and any of its past or present employees, agents, insurers, attorneys, administrators, officials, directors, shareholders, divisions, parents, members, subsidiaries, affiliates, predecessors, successors, employee benefit plans, and the sponsors, fiduciaries, or administrators of the Company's employee benefit plans.

3.      The Executive acknowledges that the Executive is waiving and releasing rights that the Executive may have under the ADEA and other federal, state and local statutes contract and the common law and that this Release is knowing and voluntary. The Executive and the Company agree that this Release does not apply to any rights or claims that may arise after the date of execution by Executive of this Release. The Executive acknowledges that the consideration given for this Release is in addition to anything of value to which the Executive is already entitled. The Executive further acknowledges that the Executive has been advised by this writing that: (i) the Executive should consult with an attorney prior to executing this Release; (ii) the Executive has up to twenty-one (21) days within which to consider this Release, although the Executive may, at the Executive's discretion, sign and return this Release at an earlier time, in which case

the Executive waives all rights to the balance of this twenty-one (21) day review period; and (iii) for a period of 7 days following the execution of this Release in duplicate originals, the Executive may revoke this Release in a writing delivered to the Chairman of the Board of Directors of the Company (such notice may be delivered via electronic mail), and this Release shall not become effective or enforceable until the revocation period has expired.

4.      This Release does not release the Company Released Parties from (i) any obligations due to the Executive under the Separation Terms, (ii) any rights Executive has to indemnification by the Company and to directors and officers liability insurance coverage, (iii) any vested rights the Executive has under any equity award agreements (subject to the terms of such agreements), the Company's employee pension benefit and group healthcare benefit plans as a result of Executive's actual service with the Company, or (iv) any rights which cannot be waived by an employee under applicable law.

5.      The Executive represents and warrants that he has not filed any action, complaint, charge, grievance, arbitration or similar proceeding against the Company Released Parties.

6.      This Release is not an admission by the Company Released Parties or the Employee Releasing Parties of any wrongdoing, liability or violation of law.

7.      the Executive shall continue to be bound by the restrictive covenants contained in the Employment Agreement (during the Restricted Period (as defined in the Employment Agreement), with respect to Section 6 of the Employment Agreement).

8.      This Release shall be governed by and construed in accordance with the laws of the State of [Illinois], without reference to the principles of conflict of laws.

9.      Each of the sections contained in this Release shall be enforceable independently of every other section in this Release, and the invalidity or unenforceability of any section shall not invalidate or render unenforceable any other section contained in this Release.

10.     **The Executive acknowledges that the Executive has carefully read and understands this Release, that the Executive has the right to consult an attorney with respect to its provisions and that this Release has been entered into knowingly and voluntarily.  The Executive acknowledges that no representation, statement, promise, inducement, threat or suggestion has been made by any of the Company Released Parties to influence the Executive to sign this Release except such statements as are expressly set forth herein or in the Employment Agreement.**

Executive has executed this Release as of the day and year first written above.


                                  EXECUTIVE


                                  _____
                                  Charlie Cole